CLERK'S OFFICE U.S. DIST. COURT
AT BIG STONE GAP, VA
FILED

JAN 22 2009

JOHN F CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **JOSEPH B. PRESLEY,** | ) |
| Plaintiff, | ) Civil Action No. 2:08cv00012 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) BY: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** | ) SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. | ) |
| | ) |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

## I. Background and Standard of Review

The plaintiff, Joseph B. Presley, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Presley's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings

-1-

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Presley protectively filed his applications for DIB and SSI on December 13, 2005, alleging disability as of July 1, 2005, due to back problems, bilateral hearing loss, nerve problems and leg numbness. (Record, ("R."), at 67-71, 105.) The claims were denied initially and upon reconsideration. (R. at 42-49, 52-60.) Presley then requested a hearing before an administrative law judge, ("ALJ"). (R. at 61.) The ALJ held a hearing on January 8, 2007, at which Presley testified and was represented by counsel. (R. at 339-78.)

By decision dated April 27, 2007, the ALJ denied Presley's claims. (R. at 13-25.) The ALJ found that Presley met the disability insured status requirements of the Act for DIB purposes on the alleged onset date, noting that Presley would continue to meet the necessary requirements through September 30, 2010. (R. at 24.) The ALJ also found that Presley had not performed any substantial gainful activity since the alleged onset date. (R. at 24.) The ALJ determined that the medical evidence established that Presley suffered from severe impairments, namely a back disorder,

Case 2:08-cv-00012-GMW-PMS   Document 16   Filed 01/22/09   Page 2 of 42   Pageid#: 64

chronic pulmonary disease, ("COPD"), and bilateral hearing loss. (R. at 24.) However, the ALJ found that Presley did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) The ALJ further found that Presley's allegations regarding his limitations were not totally credible. (R. at 24.) The ALJ determined that Presley retained the residual functional capacity to perform light[1] work that did not involve concentrated exposure to noise, odors, fumes, dusts, gases, hazards, unprotected heights or dangerous machinery. (R. at 24.) The ALJ found that the limitations imposed by Presley's impairments might not preclude him from performing his past relevant work as a convenience store owner/operator. (R. at 24.) The ALJ acknowledged that Presley's limitations prevented him from performing the full range of light work; however, he determined that there were a significant number of jobs in the national economy that Presley was capable of performing, including jobs as a cashier, food preparation worker and fast food worker. (R. at 24.) Thus, the ALJ concluded that Presley was not under a disability as defined in the Act and that he was not entitled to benefits. (R. at 24-25.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

After the ALJ issued his decision, Presley pursued his administrative appeals and sought review of the ALJ's decision, (R. at 12), but the Appeals Council denied his request for review. (R. at 5-9.) Presley then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

Case 2:08-cv-00012-GMW-PMS   Document 16   Filed 01/22/09   Page 3 of 42   Pageid#: 65

decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2008).

## II. Facts[2]

Presley was born in 1958, (R. at 67, 84), which, at the time of the hearing, classified him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). According to the record, Presley has a high school education, (R. at 110), and past relevant work as a coal miner, a pressure washer, a roofer, a stacker and as a convenience store owner/operator. (R. at 20, 87, 98.)

At the hearing before the ALJ on January 8, 2007, Presley testified that he did not have a driver's license because it had been revoked due to a driving under the influence arrest. (R. at 343.) Presley explained that the arrest occurred approximately four years prior to the hearing, noting that he had not been able to have his license reinstated because of financial reasons. (R. at 343.) Presley testified that he worked as a coal miner from 1978 to 1994, where he operated various mining equipment and performed general labor. (R. at 344.) He further explained that some of his job duties as a coal miner required him to lift 80-pound bags of rock dust and 50 to 60-pound blocks. (R. at 344.) Presley noted that, while working in the mines, and subsequent to his work in the mines, he operated his own pressure washing business. (R. at 344.) He indicated that the pressure washing job required him to hold back about 120 to 160 pounds of pressure while operating the pressure washer. (R. at 345.) He also

---

[2]The relevant time period to this court's decision regarding Presley's claims is July 1, 2005, his alleged onset date, through the date of the ALJ's decision. Any medical records summarized within this opinion not relevant to that time period are included only for clarity of the record and to fully represent the extent of Presley's impairments and treatment.

-4-

testified that the job required him to climb ladders in order to clean roofs and other high objects. (R. at 345.) Additionally, Presley testified that he was the owner of a convenience store for three years. (R. at 345.) He noted that he did not maintain the accounting records, explaining that his ex-wife performed those duties. (R. at 345.)

Presley testified that he was currently unable to work because of lower back pain and leg numbness. (R. at 345.) He testified that he experienced leg swelling, which impacted his ability to walk. (R. at 345-46.) Presley stated that he "can't even walk hardly five minutes [because he has to] stop and rest." (R. at 346.) He described the pain as constant, explaining that he experienced lower back pain that radiated into his hips. (R. at 346.) Presley testified that his left leg stayed numb. (R. at 346.) He further testified that the pain occurred "mostly every day" and that he usually slept in an upright position because lying down caused lower back pain. (R. at 346.) Presley stated that his pain affected his ability to bend over, indicating that when he bends over, he cannot straighten back up because his back "catches." (R. at 346.) Presley also testified that his condition resulted in difficulties in his ability to stoop and go up and down stairs. (R. at 346.) When Presley explained that he had difficulties going up and down stairs, the ALJ asked him how he got up the front steps of the courthouse. (R. at 347.) Presley stated that, although he was able to climb the stairs, he was "sick as a dog" by the time he entered the courthouse, noting that he had to use a cane. (R. at 347.) He also stated that "[he] didn't think [he] was going to get in [the courthouse]." (R. at 347.)

Presley testified that he took Lortab and Klonopin to relieve his pain, but commented that the medication only helped for a couple of hours. (R. at 348.) He

Case 2:08-cv-00012-GMW-PMS   Document 16   Filed 01/22/09   Page 5 of 42   Pageid#: 67

explained that after approximately two hours, "constant pain [was] right back again" and that, although the medication helped take the edge off and eased the pain some, it did not relieve the pain completely. (R. at 348.) Presley stated that his back pain affected his ability to lift, noting that it caused terrible pain. (R. at 348.) He also testified that he very seldom went shopping with his wife because of his inability to walk for extended periods of time. (R. at 349.) He indicated that he could not help unload groceries due to his back problems. (R. at 349.) Presley said that his back problems had not improved, explaining that, in fact, they had worsened. (R. at 349.) He further stated that his problems had changed his life, testifying that "[w]hen [he] was working the mines, there wasn't [any]thing [that could] stop [him]." (R. at 349.) Presley indicated that, during this time, he also had his own cleaning business, but said that his "back went out," thus causing him to go "downhill." (R. at 349.) Presley was asked to describe a typical day and, in response, he testified that he did "very little." (R. at 350.) He stated that he was able to clean dishes off the table and put them in the sink, but explained that he was unable to vacuum or load the washing machine or dryer. (R. at 350.) Presley testified that he was unable to bend over, explaining that he experienced constant pain across his lower back. (R. at 350.) He explained that the pain forced him to lay down, noting that the pain was somewhat relieved if he elevated his legs. (R. at 350.) Presley commented that he had to sit for approximately 30 to 40 minutes in order to relieve his pain. (R. at 350.)

The ALJ then questioned Presley, seeking clarification of his previous testimony. (R. at 351.) The ALJ noted that Presley had previously testified that he had to sleep sitting up because it hurt too much to lay down, but then later testified that he was forced to lay down during the day to relieve his pain. (R. at 351.) Presley

Case 2:08-cv-00012-GMW-PMS   Document 16   Filed 01/22/09   Page 6 of 42   Pageid#: 68

stated that he had to elevate his legs to address the swelling in his lower extremities. (R. at 351.) He stated that his doctor had taken him off of a fluid pill and that further testing had been scheduled to determine the cause of his leg swelling. (R. at 351.) Presley testified that his doctor had taken him off of the fluid pill because if the swelling was caused by his kidneys, the medication could harm him. (R. at 352.)

Presley testified that he alleged July 1, 2005, as his onset of disability because that was when he became "down in [his] back." (R. at 352.) He explained that his roommates had to help him get in and out of bed. (R. at 352.) Presley further explained that he had been in this condition since the alleged onset date. (R. at 352.) Based upon the above statements, the ALJ expressed concern and confusion, noting that a doctor's report indicated that Presley was on a roof working about two weeks after the alleged onset date. (R. at 352.) The ALJ asked Presley how he was able to get out of bed, climb onto the roof and injure his ankle if he were truly bedridden. (R. at 352.) Presley testified that he "had to get out of the bed and try to go provide for [him]self because somebody had to feed [him]." (R. at 352.) Presley stated that he simply carried shingles, at which point the ALJ interjected, "[t]hose packs of shingles are pretty heavy." (R. at 352.) In response, Presley explained that he did not carry the entire pack, noting that he merely carried two or three slate shingles at a time. (R. at 353.) The ALJ pointed out that Presley had previously testified that he could not lift anything, to which Presley clarified that he could lift some items shortly after the alleged onset date, but that, at the time of the hearing, he could no longer lift. (R. at 353.)

Presley commented that his condition worsened and that he began going back

Case 2:08-cv-00012-GMW-PMS   Document 16   Filed 01/22/09   Page 7 of 42   Pageid#: 69

to the doctor in September 2006. (R. at 353.) However, at the time of the hearing, Presley acknowledged that he had only seen his doctors on three occasions since September 2006. (R. at 353.) Presley testified that his financial situation prevented him from seeing his doctors more frequently. (R. at 353.) He further testified that Stone Mountain Health Services had enabled him to see a doctor more often because its services were based upon a patient's income level. (R. at 353.) Considering that Stone Mountain Health Services provided care for low income patients, the ALJ inquired as to why Presley had not sought treatment prior to September 2006. (R. at 354.) Presley stated that he had visited Stone Mountain Health Services in the past, but noted that he did not continue because he was only treated by a nurse practitioner and not a doctor. (R. at 354.)

Upon further questioning by the ALJ, Presley stated that he had been prescribed Klonopin and Lortab, acknowledging that he had signed a narcotic contract. (R. at 354.) He further stated that he was aware that the medications were not to be taken with alcohol. (R. at 355.) As such, the ALJ asked why Presley reported that he routinely consumed six beers per day and whiskey every other day. (R. at 355.) Presley stated that the information the ALJ was referring to was reported before he started going to Stone Mountain Health Services for treatment. (R. at 355.) He indicated that he had consumed alcohol attending Stone Mountain Health Services, but that he no longer consumed alcohol daily. (R. at 355.) Presley admitted that he was not following his doctor's orders regarding alcohol consumption. (R. at 355.) In addition, Presley stated that he continued to smoke despite experiencing breathing difficulties. (R. at 355.) When asked why he continued to engage in activities that his doctors had advised him to cease, he explained, "I guess [it is]

human nature." (R. at 356.)

Presley testified that his doctor had specifically recommended that he slow down his consumption of alcohol. (R. at 357.) He also stated that his doctor had suggested that he receive psychiatric counseling. (R. at 358.) Presley reiterated that he no longer drinks every day, despite what he reported at various points in the record. (R. at 358.) He admitted that he used to drink daily, but that he had slowed down about three to four months prior to the hearing. (R. at 359.) Presley noted that he understood the dangers of continuing to drink alcohol when taking the types of medications he had been prescribed. (R. at 359.) He testified that, at the beginning, it was difficult to limit his alcohol consumption, but stated that it had become easier. (R. at 359.) He stated that his doctor had arranged for him to receive alcohol counseling. (R. at 359.) Presley acknowledged that he could attend alcohol treatment on his own if he chose to do so, but noted that he elected to allow his doctor to send him to a counselor. (R. at 360.) Presley stated that quitting drinking would not help with his back problems and explained that he could not say whether it would help with his anxiety and depression. (R. at 360.) He said that he had always suffered from problems with anxiety. (R. at 360.)

Presley testified that he experienced nervousness and noted that "every little thing upset[ him]." (R. at 361.) He stated that his condition had worsened and explained that he had suffered from anxiety and depression for approximately six years. (R. at 361.) Presley testified that his depression and anxiety had worsened since September 2006. (R. at 362.) He explained that he was not able to cope with his problems well, explaining that, at times, he would discuss his problems with his

siblings. (R. at 362.) Presley further testified that he suffered from hearing problems. (R. at 363.) Presley stated that he had not had suicidal thoughts since September 2006. (R. at 363.) He also claimed that he could no longer perform the work that he used to, noting that he had tried to do things, but that he "just [could no longer] do it" due to his back problems, nerves and anxiety attacks. (R. at 365.)

Presley testified that he could probably walk for a maximum of five minutes before his pain reached the point where he was forced to stop and change positions. (R. at 365.) He acknowledged that he appeared at the hearing with a cane, but noted that it had not been prescribed by a doctor. (R. at 365.) Presley explained that he had been forced to use crutches on two previous occasions because he was unable to walk due to swelling. (R. at 366.) He noted that he could lift a gallon of milk, but commented that it hurt to lift. (R. at 366.) Presley estimated that he could probably stand in one place for approximately five minutes before the pain caused him to change positions. (R. at 366.) In addition, Presley stated that when using the restroom, he had to sit on one side of the toilet due to hip pain. (R. at 366.) Presley further explained that he could sit for about 15 minutes before becoming uncomfortable and having to change positions. (R. at 366.) He also said that the swelling in his lower extremities "comes and goes," indicating that when his back pain worsens, so does the swelling. (R. at 367.)

Ann Marie Cash, a vocational expert, also was present and testified at Presley's hearing. (R. at 368-376.) The ALJ asked Cash if there was any additional information, other than what Presley presented during his testimony or within the record, that she needed in order to render her expert opinion. (R. at 369.) Cash asked

-10-

about Presley's former employment with the water company, specifically asking if he stacked five gallon bottles of water. (R. at 369.) Presley testified that he stacked cases of water that weighed approximately 30 pounds, noting that he removed the cases from the assembly line. (R. at 369-71.) Cash identified Presley's past work as a coal miner as heavy,[3] skilled work. (R. at 372.) Furthermore, Cash noted that Presley's past work as a pressure washer and a material handler was medium,[4] unskilled work, and his work as a convenience store owner was classified as light, skilled work. (R. at 372.) However, Cash explained that it was believed that Presley's work as a convenience store owner was performed at a semiskilled level. (R. at 372.)

The ALJ then asked Cash to consider a hypothetical individual with the same age, education and work experience as Presley, who could occasionally lift and/or carry, including upward pulling, items weighing up to 20 pounds, frequently lift and/or carry, including upward pulling, items weighing up to 10 pounds, stand and/or walk and sit with normal breaks for a total of about six hours in a typical eight-hour workday. (R. at 372-73.) Further, the individual could only occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, occasionally balance, stoop, kneel, crouch and crawl, should avoid concentrated exposure to fumes, odors, dust,

---

[3]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If an individual can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2008).

[4]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2008).

gases and poor ventilation, and this individual should avoid concentrated exposure to hazards, such as dangerous machinery and unprotected and exposure to noise due to a hearing impairment. (R. at 373.) Cash agreed that the ALJ had described someone who could perform a range of light work and that these limitations would preclude Presley from performing all of his past relevant work, with the exception of his past relevant work as a convenience store operator. (R. at 373.) The ALJ asked Cash if there were other jobs available that would accommodate the limitations set forth in the hypothetical. (R. at 373.) Cash stated that the transferable skills for the semiskilled jobs would be cashiering in the light category, noting that such jobs were available in both the regional and national economies. (R. at 373.) Cash also identified sedentary,[5] semi-skilled jobs, explaining that there were jobs in that category in both the regional and national economies as well. (R. at 373.) Cash testified that, based upon the limitations set forth in the hypothetical, such an individual could also perform jobs such as a food preparation worker and a fast food worker. (R. at 375.) Additionally, Cash explained that in the sedentary, semiskilled cashier jobs, about half of the jobs would allow for a sit/stand option, but explained that, in the light category, typically no sit/stand option is available. (R. at 375.)

In a second hypothetical, the ALJ asked Cash to consider a hypothetical individual of the same age, education and past work experience as Presley, who could occasionally lift and/or carry items weighing up to eight pounds during the day, frequently lift and/or carry items weighing up to five pounds during the day, who

---

[5]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2008).

-12-

could stand and/or walk for a total of one to two hours in a typical eight-hour workday, but for only 15 minutes at a time and who could sit for a total of one hour in a typical eight-hour workday, 30 minutes without interruption. (R. at 375-76.) Cash agreed that the ALJ had described an individual that basically could not perform competitive, full-time employment. (R. at 376.) The ALJ further asked Cash to consider that the individual possessed no ability to deal with normal, usual work stresses, to function independently or to maintain attention and concentration. (R. at 376.) Cash testified that there would be no jobs available for such an individual. (R. at 376.)

In rendering his decision, the ALJ reviewed medical records from Bristol Regional Medical Center; Davenport Clinic; Dr. William Humphries, M.D.; Julie Jennings, Ph.D., a state agency psychologist; Dr. Richard M. Surrusco, M.D., a state agency physician; Associated Hearing & Diagnostics; Dr. Michael J. Hartman, M.D., a state agency physician; Dr. Shirish Shahane, M.D., a state agency physician; Richard Milan, Ph.D., a state agency psychologist; and Dr. Patricia Vanover, M.D. Counsel for the claimant submitted additional medical records from Stone Mountain Health Services, Buchanan General Hospital and Southwest Regional Jail to the Appeals Council.[6]

Presley was treated at Bristol Regional Medical Center, ("BRMC"), from September 4, 2003, to September 10, 2003. (R. at 170-76.) On September 4, 2003,

---

[6]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

-13-

Presley was admitted to BRMC on a referral from Johnson Memorial Hospital due to depression and suicidal thoughts. (R. at 172.) According to the treatment notes of Dr. Sebastian L. Ornopia, M.D., prior to this hospitalization, Presley had no previous inpatient hospitalizations or outpatient treatment. (R. at 172.) Presley indicated that he could no longer cope with his life and reported suicidal thoughts, noting that he planned to shoot himself. (R. at 172.) Presley further reported feelings of hopelessness, helplessness, crying spells, inability to cope with stressors, poor appetite, poor sleep patterns, lack of energy, problems with concentration and focus, uncertainty as to what to do when he wakes each morning and uncertainty as to what direction he should choose, with significant anhedonia. (R. at 172.) Presley denied any auditory or visual hallucinosis and any use of illicit substances. (R. at 172.) He acknowledged that in the three months prior to this particular visit, he had been drinking approximately two or three beers per week. (R. at 172.) In addition, he reported that he smoked one half to one full pack of cigarettes per day. (R. at 172.)

Dr. Ornopia noted that Presley's problems appeared to stem from life stressors, such as marital problems, economic problems and the loss of family members. (R. at 172.) Presley claimed that his problems worsened following the death of his mother. (R. at 172.) He explained that his problems with his family and finances caused him to contemplate suicide to the extent that he obtained a gun and went to his basement with intentions of killing himself. (R. at 173.) Presley claimed that his wife saw him and told him not to kill himself in the house because children were there. (R. at 173.) Then, according to Presley, he sought help from a friend who had experienced problems with depression in the past, noting that the friend took him to Johnson Memorial Hospital. (R. at 173.)

-14-

In reviewing Presley's past medical history, Dr. Ornopia's treatment notes showed that Presley denied any medical problems, stating that, with the exception of the psychiatric problems, he had been significantly healthy. (R. at 173.) A review of systems indicated good overall physical health, but as to his psychiatric condition, it was noted that he had problems with increasing depression and significant suicide plans that were related to family stressors. (R. at 174.) A mental status examination revealed the appearance of dejection and recent suicidal thoughts, but the examination was otherwise normal. (R. at 174.) Dr. Ornopia's assessment was a major depressive disorder, single, chronic and severe with recent strong suicidal thoughts, with no psychotic features. (R. at 175.) In addition, Dr. Ornopia reported problems related to Presley's primary support group, a history of losses from death and economic problems. (R. at 175.) Dr. Ornopia also assessed Presley's then-current Global Assessment of Functioning score, ("GAF"), at "around 35."[7] (R. at 175.)

In summarizing the treatment plan, Dr. Ornopia noted that Presley was voluntarily admitted to the psychiatric facility at BRMC and was placed on suicide precautions. (R. at 175.) Presley was given Seroquel for insomnia, to reduce suicidal thoughts, as well as Zoloft and Ativan, in order to address his ongoing stressors,

---

[7]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV at 32.

-15-

anxiousness and nervousness. (R. at 175.) The plan was to stabilize Presley's symptoms and to have him follow up as an outpatient with a mental health provider. (R. at 175.) Dr. Ornopia also recommended marriage counseling. (R. at 175.) Dr. Ornopia ordered an electrocardiogram, ("EKG"), on September 5, 2003, which revealed abnormal findings due to an incomplete right bundle branch block. (R. at 176.)

Presley was then transferred to the care of Dr. Ashvin A. Patel, M.D., who noted that Presley was very flat, guarded and showing fear and anxiety. (R. at 170.) Dr. Patel further noted that Presley was particularly resentful toward many of the things going on in his life, such as financial strain, family problems and job stresses. (R. at 170.) During Presley's hospitalization, Dr. Patel observed that Presley began to feel less depressed, less anxious and that he reported no active suicidal thoughts. (R. at 170.) Presley also reported that he believed the medication had helped him. (R. at 170.) Presley began to participate in activities and in group therapy, continuing to deny any suicidal thoughts. (R. at 170.) While hospitalized, it was learned that Presley had an outstanding warrant against him, related to domestic violence. (R. at 170.) Thus, he was discharged to the custody of the authorities. (R. at 171.) Presley was not actively suicidal at the time of his discharge. (R. at 171.) He was prescribed Zoloft, Seroquel and Ativan. (R. at 171.) Presley also agreed to proceed with individual psychotherapy and possible marital counseling. (R. at 171.)

Presley was treated at Stone Mountain Health Services' Davenport Clinic from April 1, 2005, to January 5, 2006. (R. at 177-99.) On April 1, 2005, Presley presented with hearing problems, congestion, indigestion, back pain, right knee pain

-16-

and nerve problems. (R. at 191.) A review of systems noted paresthesias that radiated from the hip down the outer lateral side to the knee. (R. at 191.) Presley indicated that his back pain resulted from falling off of a ladder in November 2003. (R. at 191.) Presley reported that the pain in his leg worsened when he laid down. (R. at 191.) Presley also reported that he had been depressed since his divorce, but he denied any crying spells. (R. at 191.) He noted that he experienced difficulty sleeping, decreased concentration and that he was not involved in any community activities. (R. at 191.) Presley returned to the Davenport Clinic on April 5, 2005, complaining of hearing problems. (R. at 190.) He reported constant ringing in his hears, noting that it had occurred for four months, and he also stated that he had experienced problems with balance for more than two weeks prior to this particular visit. (R. at 190.)

Presley presented to the Davenport Clinic on July 13, 2005, complaining of an injury to his left foot and ankle. (R. at 188.) He reported that the injury occurred when he tripped while on a roof, explaining that he injured the top of his left foot. (R. at 188.) Upon examination, no visible abnormality was observed. (R. at 189.) An x-ray was ordered and Presley was prescribed Paxil and ibuprofen. (R. at 189.) An x-ray of the left ankle revealed no fracture, dislocation, arthritis bone or joint abnormality. (R. at 193.) Presley returned on July 19, 2005, for a follow-up regarding his left foot. (R. at 186.) He indicated that his foot was doing better, but noted that setting his heel down caused discomfort. (R. at 186.) The treatment notes showed that Presley was not working at the time of this visit; however, a work release was given. (R. at 186.) It was further noted that Presley could stand on his injured foot for approximately one and a half minutes and that he sometimes used a cane. (R.

at 186.) He was diagnosed with an ankle sprain and advised to treat his pain with Tylenol and ibuprofen. (R. at 187.) Presley also was instructed to rest and elevate the ankle. (R. at 187.) Presley presented for a follow-up appointment on July 26, 2005, indicating that he continued to have pain on the top of the left foot. (R. at 184.) He acknowledged that his ankle was feeling better and that he continued to take ibuprofen for relief. (R. at 184.) No visible abnormality was observed and there were no signs of a limited range of motion. (R. at 185.) Pain was present upon palpation to the top of the foot. (R. at 185.) Presley was diagnosed with a foot injury and was advised to continue taking ibuprofen and to refrain from working for the next week. (R. at 185.)

Presley again sought treatment at the Davenport Clinic on December 1, 2005. (R. at 181-82.) He complained of swelling in his feet, lower back pain, left leg numbness and weakness in the right ankle. (R. at 181.) Presley also reported that he experienced panic attacks, explaining that he had bad nerves. (R. at 181.) The assessment noted COPD, back, foot and leg pain, as well as depression and anxiety. (R. at 182.) Presley was advised to stop smoking. (R. at 182.) Chest and lumbosacral spine x-rays were ordered. (R. at 192.) On December 5, 2005, the x-rays were performed. (R. at 192.) The chest x-ray showed the heart and mediastinum to be normal and showed mild interstitial fibrosis, but no pneumonia was seen and the bony thorax was unremarkable. (R. at 192.) The impression revealed mild COPD. (R. at 192.) The lumbosacral spine x-ray showed a mild degree of spur formation of the lumbar spine, but no recent bone injury or degenerative disc disease was observed. (R. at 192.) There was an old fracture of the T-12 vertebra and it was recommended that thoraco-lumbar x-rays be taken to rule out disc disease between

-18-

the T-11 and T-12 vertebra. (R. at 192.)

Presley returned to the Davenport Clinic on December 13, 2005, complaining of back pain. (R. at 179.) In addition, he claimed he was coughing up blood the day prior to this particular visit. (R. at 179.) Presley stated that he experienced pain in his back when he coughed. (R. at 179.) He also reported numbness in his right shoulder, but explained that the pain was not as bad as it had been the day before and, at the time of the examination, he was no longer coughing up blood. (R. at 179.) He was diagnosed with back pain and bronchitis. (R. at 180.) The treatment notes indicated that if he started coughing blood again, further testing would be necessary. (R. at 180.) Once again, Presley was instructed to stop smoking. (R. at 180.) Presley presented on January 5, 2006, complaining of left lower back pain, chest congestion and coughing up blood. (R. at 177-78.) Among other things, Presley was diagnosed with COPD, tobacco abuse, back pain and neck pain. (R. at 178.) He was prescribed Toradol, Soma and Ultram and was advised to stop smoking. (R. at 178.)

On February 15, 2006, Dr. William Humphries, M.D., completed an independent medical expert report at the request of Disability Determination Services. (R. at 200-04.) Dr. Humphries noted that Presley's chief medical condition was in relation to his back problems. (R. at 200.) Presley reported numbness, swelling and diminished functioning in both feet and both legs. (R. at 200.) He explained that he experienced numbness ranging from his hips to his knees as well as pain along his entire back. (R. at 200.) Presley informed Dr. Humphries that he had sought medical treatment to address his condition, but reported that no specific diagnosis was given. (R. at 200.) No surgery or shots had been required to treat his back problem, but

-19-

Presley indicated that he continued to experience pain in "most of the entire back but primarily between the scapulae." (R. at 200.) Presley also reported that the pain was constant and that it was exacerbated by bending and other movements/uses of the back. (R. at 200.) While no loss of bowel, bladder or extremity control was reported, it was noted that he suffered from numbness in both legs from the hips to the knees. (R. at 200.) Presley stated that he could walk a maximum of approximately a quarter mile without having to stop and rest. (R. at 200.)

A review of systems revealed that Presley had suffered from breathing problems for about three months. (R. at 200.) It was noted that Presley experienced dyspnea on mild exertion such as walking. (R. at 200.) Dr. Humphries noted that, at the time of the evaluation, Presley had not used any medication to address his breathing problems. (R. at 200.) Presley also complained of hearing problems, stating that his problems had increased over the past three years. (R. at 200.) Presley stated that he smoked a pack of cigarettes per day, that he normally consumed a six-pack of beer daily and that he occasionally consumed whiskey. (R. at 201.)

Upon examination, Dr. Humphries found that Presley was alert, pleasant and in no distress. (R. at 201.) His neck range of motion was normal, while his back range of motion was slightly reduced with mild dorsal kyphosis. (R. at 201.) No scoliosis or paravertebral muscle spasms were observed, but there was mild tenderness to palpation in the left paraspinous musculature of the mid-thoracic spine. (R. at 201.) A straight leg raise was negative to 90 degrees sitting bilaterally. (R. at 201.) Presley's joint range of motion of the upper extremities was full without tenderness, heat, swelling or deformity, except for some mild synovial thickening of

-20-

the interphalangeal joints of some of the fingers of each hand. (R. at 201.) Presley's lower extremity joint range of motion was full without tenderness, heat, swelling or deformity, except for some mild synovial thickening of some of the interphalangeal and metatarophalangeal joints of the toes of both feet. (R. at 201.) The lower extremities revealed no significant venous stasis changes, no varicosities were noted and the dorsalis pedis pulses and posterior tibials were 1+ and equal. (R. at 202.)

A neurological examination was unremarkable, vision was normal and his hearing was reported as markedly diminished. (R. at 202.) A mental status examination revealed that Presley was alert and oriented and that his behavior was appropriate. (R. at 202.) Dr. Humphries further noted that Presley's thought and idea content were within normal limits, his memory was intact, his intelligence was within normal range and his affect and grooming were appropriate. (R. at 202.) It was determined that it was doubtful that Presley could manage his own funds, considering his daily use of alcohol. (R. at 202.) Dr. Humphries diagnosed Presley with diminished hearing, moderately severe, probable pityriasis rosea, chronic thoracic and lumbar strain with peripheral neuropathy of both lower extremities, mild degenerative joint disease in both hands and feet and mild COPD. (R. at 203.) Dr. Humphries opined that, based on objective findings, Presley would be limited to sitting, standing and walking for six hours in a typical eight-hour workday, with the ability to occasionally lift items weighing up to 25 pounds and frequently lift items weighing up to 10 pounds. (R. at 203.) Dr. Humphries also found that Presley would be limited to only occasional climbing, stooping, kneeling, crouching and crawling, and that he should avoid heights, hazards and fumes. (R. at 203.)

On February 24, 2006, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Presley's impairments were not severe. (R. at 205-18.) Jennings determined that Presley suffered from an affective disorder, namely a history of depression, but noted that the medically determinable impairment did not precisely satisfy the required diagnostic criteria. (R. at 208.) Jennings placed no limitations on Presley's abilities to perform activities of daily living, maintaining social functioning, concentration, persistence or pace. (R. at 215.) Jennings also found that Presley had experienced no episodes of decompensation. (R. at 215.) She further found that Presley's allegations were only partially credible. (R. at 215.)

Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), on February 24, 2006. (R. at 219-24.) Dr. Surrusco found that Presley had the ability to occasionally lift and/or carry items weighing up to 50 pounds, frequently lift and/or carry items weighing up to 25 pounds and stand and/or walk and sit for a total of about six hours in a typical eight-hour workday. (R. at 220.) Dr. Surrusco also found that Presley was unlimited in his ability to push and/or pull. (R. at 220.) He opined that Presley could only occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 221.) Dr. Surrusco imposed no manipulative, visual, communicative or environmental limitations. (R. at 221-22.) Dr. Surrusco also opined that Presley's allegations as to his symptoms and limitations were only partially credible. (R. at 224.) On April 13, 2006, Dr. Michael J. Hartman, M.D., a state agency physician, completed a PRFC noting findings identical to the findings of Dr. Surrusco. (R. at 230-36.)

Presley presented to Carol R. Ruynon, Au.D., for a consultative examination at Associated Hearing & Diagnostics on March 14, 2006, and March 21, 2006. (R. at 225-29.) Presley reported that he had experienced hearing problems for approximately four years and that he had poor balance. (R. at 227.) He also reported a history of dizziness, sinus problems and allergies. (R. at 225.) A review of systems noted that Presley's general health was poor. (R. at 227.) An otoscopic examination prior to testing showed that Presley's ear canals were clear bilaterally. (R. at 225.) Speech reception thresholds were recorded at 50 decibels in the right ear and 45 decibels in the left ear. (R. at 225.) Results of the hearing evaluations revealed a moderate to severe "cookie-bite" configuration sensorineural hearing loss bilaterally. (R. at 225.) Runyan noted that Presley had good work recognition skills and found that Presley would benefit from biaural amplification. (R. at 225.) Presley was advised to schedule a follow-up appointment. (R. at 225.)

On September 13, 2006, Dr. Shirish Shahane, M.D., another state agency physician, conducted a PRFC finding that Presley could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds and stand and/or walk and sit for a total of about six hours in a typical eight-hour workday. (R. at 237-43.) Dr. Shahane found that Presley was unlimited in his ability to push and/or pull. (R. at 238.) In addition, it was determined that Presley could only occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 239.) No manipulative, visual or communicative limitations were noted. (R. at 239-40.) However, Dr. Shahane did impose certain environmental limitations, noting that Presley should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery and heights. (R. at 240.) Dr. Shahane

-23-

concluded that Presley's allegations as to his symptoms and limitations were only partially credible. (R. at 242.)

Richard Milan, Ph.D., a state agency psychologist, completed a PRTF indicating that Presley had no medically determinable mental impairment. (R. at 244-57.) Milan noted no limitations on Presley's abilities to perform activities of daily living, to maintain social functioning or to maintain concentration, persistence or pace. (R. at 254.) Milan noted that Presley had not experienced any episodes of decompensation. (R. at 254.) Lastly, Milan found that Presley's mental allegations were not credible. (R. at 256.)

Presley was treated by Dr. Patricia Vanover, M.D., at Stone Mountain Health Services, ("Stone Mountain"), from September 27, 2006, to March 5, 2007. (R. at 258-86.) On September 27, 2006, Presley presented to Stone Mountain reporting a history of severe chronic low back syndrome and severe anxiety disorder. (R. at 262.) Presley referenced his previous hospitalization in September 2003 due to depression and suicidal ideations, noting that his condition had not reached that point again, but he stated that he remained extremely anxious to the point that he sometimes could not hold a coffee cup. (R. at 262.) Presley also expressed financial concerns, noting that he could not afford to visit a doctor over the course of the year prior to this visit. (R. at 262.) Presley claimed that, during this time period, his symptoms had increased, indicating that he was unable to sleep or eat and that his back pain had worsened. (R. at 262.) He also reported that he was largely restricted to his couch or bed, which rendered him unable to do most things. (R. at 262.) Presley informed Dr. Vanover that he could not lift anything weighing more than about 10 pounds without suffering

-24-

severe pain. (R. at 262.) He also reported chronic sinus congestion. (R. at 262.) Upon examination, Presley was observed to be chronically ill, but in no acute distress. (R. at 262.) Dr. Vanover noted marked swelling of the mucous membranes and indicated that the mouth and throat exhibited slight hyperemia with a moderate amount of purulent-appearing post-nasal drainage in the pharynx. (R. at 262.) An examination of the lungs revealed increased AP diameter of the chest, with coarse rhonchi present throughout the upper airways, but no wheezes or rales were detected. (R. at 262.) Dr. Vanover's assessment noted chronic low back syndrome, chronic sinusitis and chronic severe anxiety disorder. (R. at 263.) Presley was prescribed Klonopin, Tylenol 3 and Norel. (R. at 263.) He was advised to return to the clinic in one month and was asked to sign a controlled substance contract. (R. at 263.) In addition, Dr. Vanover recommended that Presley begin a gentle exercise program. (R. at 263.)

Presley presented to Dr. Vanover on October 30, 2006, for a follow-up appointment regarding his back pain. (R. at 271.) Dr. Vanover noted no significant changes in Presley's condition. (R. at 271.) Presley indicated that Tylenol 3 had provided very little relief, but acknowledged that the Klonopin provided good pain relief. (R. at 271.) Presley reported that he was sleeping better, but indicated that he continued to awake early, noting that once he woke up, he could not go back to sleep. (R. at 271.) He also reported continued severe hip pain that radiated down to his knee, accompanied by paresthesias. (R. at 271.) It also was noted that Presley had developed ankle edema. (R. at 271.) Dr. Vanover diagnosed Presley with chronic low back pain and chronic left hip pain. (R. at 271.) Presley's Klonopin prescription was refilled, he was prescribed Dyazide and was instructed to discontinue the use of

-25-

Tylenol 3. (R. at 271.) Dr. Vanover reminded Presley of the terms of the pain management contract and instructed him as to more conservative means of pain control. (R. at 271.) Presley was advised to return in one month. (R. at 271.)

On October 30, 2006, Dr. Vanover completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical), finding that Presley could occasionally lift and/or carry items weighing up to 12-15 pounds, frequently lift and/or carry items weighing up to eight pounds, stand/walk and sit for a total of one hour in a typical eight-hour workday, one half hour of which without interruption. (R. at 258-59.) Dr. Vanover also found that Presley could frequently balance, occasionally climb, stoop and kneel, and that he could never crouch or crawl. (R. at 259.) According to Dr. Vanover, Presley's impairments affected his ability to push/pull. (R. at 259.) Additionally, Dr. Vanover noted that, due to Presley's impairments, he should not be exposed to vibrations. (R. at 259.)

Dr. Vanover also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental), on October 30, 2006. (R. at 260-61.) With regards to Presley's ability to make occupational adjustments, Dr. Vanover determined that Presley possessed a fair ability to follow work rules, relate to co-workers, use judgment with the public and interact with supervisors. (R. at 260.) However, Dr. Vanover found that Presley had a poor or no ability to deal with the public, deal with work stresses, function independently or maintain attention and concentration. (R. at 260.) As for Presley's ability to make performance adjustments, Dr. Vanover found that Presley had a good ability to understand, remember and carry out simple job instructions, a fair ability to understand, remember and carry out detailed, but not

-26-

complex, job instructions and a poor or no ability to understand, remember and carry out complex job instructions. (R. at 261.) Dr. Vanover also determined that Presley had a good ability to maintain personal appearance, behave in an emotionally stable manner and relate predictably in social situations; however, she noted that Presley's ability to demonstrate reliability was unknown. (R. at 261.) Lastly, it was concluded that Presley was capable of managing his benefits in his best interest. (R. at 261.)

Presley returned to Stone Mountain for a follow-up appointment with Dr. Vanover on November 29, 2006. (R. at 269-70.) Presley reported continued problems with his lower back, left leg pain and swelling and severe sinus drainage. (R. at 269.) He indicated that he was unable to afford the Norel prescription that Dr. Vanover had previously prescribed for his sinus condition. (R. at 269.) Dr. Vanover noted that Presley responded well to the fluid medication that she had given him and explained that Presley's blood pressure was under better control. (R. at 269.) Presley acknowledged that he was sleeping better and that his anxiety had improved. (R. at 269.) Despite the improvement in his sleep patterns and anxiety level, Presley stated that he had been anxious in the two weeks prior to the visit, noting that the Klonopin was not working as well as it had in the past and that he had not slept well during this two week period. (R. at 269.) Presley told Dr. Vanover that he needed an increase in his medication. (R. at 269.) Dr. Vanover noted that Presley appeared to be uncomfortable, reporting that there was marked tenderness in the paraspinal musculature and that the range of motion of the back was markedly restricted, secondary to pain. (R. at 269.) Presley was diagnosed with chronic low back syndrome, chronic anxiety disorder and chronic sinusitis. (R. at 269.) Presley was prescribed Klonopin, Lortab and Lodrane, and he was sent for testing to determine

-27-

if his kidney function was intact. (R. at 270.) Dr. Vanover once again reminded Presley of the terms of the pain management contract and advised him to return for a follow-up in one month. (R. at 270.)

Dr. Vanover again completed both a Medical Assessment Of Ability To Do Work-Related Activities (Mental) and a Medical Assessment Of Ability To Do Work-Related Activities (Physical) on December 5, 2006. (R. at 264-68.) Notably, Dr. Vanover's findings changed in less than two months. Dr. Vanover found that Presley was able to occasionally lift and/or carry items weighing up to eight pounds, frequently lift and/or carry items weighing up to five pounds, stand/walk for about one to two hours in a typical eight-hour workday, one fourth of an hour without interruption and sit for about one hour in an eight-hour workday, one half hour of which without interruption. (R. at 265.) Dr. Vanover noted that Presley could frequently balance, occasionally climb, stoop and crouch, and that he could never kneel or crawl. (R. at 266.) The findings as to Presley's physical functions and environmental restrictions were unchanged. (R. at 266.)

In the December 5, 2005, mental assessment, Dr. Vanover found that Presley had a fair ability to follow work rules, relate to co-workers, use judgment with the public, interact with supervisors, function independently and maintain attention and concentration. (R. at 267.) Presley was found to have a poor or no ability to deal with the public and work stresses. (R. at 267.) While Dr. Vanover found that Presley possessed a fair ability to understand, remember and carry out simple job instructions, she determined that Presley had a poor or no ability to understand, remember and carry out complex and detailed job instructions. (R. at 268.) Dr. Vanover also found

-28-

that Presley had a fair ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 268.) Just as in her previous assessment, Dr. Vanover concluded that Presley was capable of managing his benefits in his best interest. (R. at 268.)

On January 22, 2007, Presley sought treatment at Stone Mountain with chief complaints of right knee pain and swelling, lower back pain, nausea and vomiting. (R. at 275.) Dr. Vanover noted that Presley showed marked tenderness over the lumbosacral area. (R. at 275.) The assessment noted chronic lumbosacral pain, chronic aniexty disorder and possible deep vein thrombosis in the right leg. (R. at 275.) Dr. Vanover prescribed Klonopin and Lortab, and she advised Presley to seek medical attention at Buchanan General Hospital, ("Buchanan General"). (R. at 275.)

Presley was admitted to Buchanan General on January 22, 2007, with a chief complaint of increasing bilateral leg swelling. (R. at 290.) After presenting to Dr. Vanover, he was sent to Buchanan General to rule out possible deep vein thrombosis. (R. at 290.) An ultrasound of both lower extremities was performed, which revealed deep vein thrombosis of both lower extremities. (R. at 290, 304.) Presley was started on heparin protocol and was then admitted to the hospital. (R. at 290.) It was noted that Presley could not hold down solid food, therefore, he was placed on a mechanical soft diet and liquid diet. (R. at 290.) Presley also complained of sinus congestion, postnasal drip, thick mucopurulent sputum and leg and back pain radiating to the right leg. (R. at 290.) Upon examination, Presley had calf muscle swelling with redness and warmness in the right leg more than the left leg. (R. at 291.) Presley was diagnosed with bilateral deep vein thrombosis. (R. at 292.) Furthermore, the

-29-

secondary diagnosis included: dysphagia, with testing ordered to rule out a tumor or stricture, etiology unclear; abnormal liver enzymes secondary to alcoholism, rule out other liver pathology; chronic low back pain; and sinusitis. (R. at 292.) Appropriate blood work was ordered and the heparin drip was continued. (R. at 292.) Presley was given Levaquin, Claritin, Mucinex and Flonase for his sinusitis and Lortab and Klonopin for pain. (R. at 292.)

An upper gastrointestinal series with esophagogram was performed on January 23, 2007, which revealed a hiatal hernia with significant gastroesophageal reflux, ("GERD"), and no evidence of peptic ulcer disease. (R. at 305.) In addition, on January 24, 2007, multiple x-ray views of the chest were taken, with no acute pathology observed. (R. at 306.)

Presley was discharged from Buchanan General on January 26, 2007, with a primary diagnosis of acute bilateral deep vein thrombosis. (R. at 288.) The secondary diagnoses were a hiatal hernia with moderate GERD with dysphagia, abnormal liver enzymes secondary to alcoholism, chronic low back pain and sinusitis. (R. at 288.) Presley's condition was improved and stable at the time of discharge. (R. at 289.) He was prescribed Klonopin, Nasalide nasal spray, Mucinex, Lortab, Claritin, Reglan, Coumadin and folic acid. (R. at 289.) Presley was advised to continue with normal activity as tolerated and was instructed to follow up with Dr. Vanover on January 29, 2007. (R. at 289.)

Presley presented to Stone Mountain on January 30, 2007, for the purposes of medication refills and to have International Normalized Ratio, ("INR"), blood testing

performed. (R. at 276.) Presley reported much less pain than he was experiencing upon discharge from Buchanan General. (R. at 276.) He acknowledged that his medication was controlling the pain, but it was noted that when Presley stayed on his feet for an extended time, he experienced a considerable amount of swelling in the right lower extremity. (R. at 276.) Nonetheless, Presley stated that he was attempting to stay active, which Dr. Vanover encouraged. (R. at 276.) Presley reported no other complaints. (R. at 276.) Dr. Vanover's assessment noted deep vein thrombosis in the right lower extremity, which was being resolved. (R. at 276.) Presley was ordered to the laboratory for INR testing and his Coumadin, folic acid, Protonix and Motrin were all refilled. (R. at 276.) Dr. Vanover also noted that his Lortab dosage had been increased. (R. at 276.) Dr. Vanover advised Presley to remain as active as possible on the leg, but explained that when sitting, the leg should be elevated. (R. at 276.)

Presley returned to Stone Mountain on February 21, 2007, for a follow-up visit. (R. at 277.) Dr. Vanover's assessment noted acute gastroenteritis, chronic low back pain, status post deep vein thrombosis, hypertension, chronic sinusitis and chronic ethanol abuse. (R. at 277.) Presley was instructed to continue his medications, was given a Combivent inhaler, was restarted on Coumadin and was sent to the laboratory for further testing. (R. at 277.)

Presley was incarcerated in Southwest Virginia Regional Jail from March 7, 2007, to October 16, 2007. (R. at 307-38.) During this time period, Presley complained of lower back pain, numbness in his left leg, hearing problems, acid reflux, sinus problems and COPD. (R. at 307-38.) The treatment notes also showed that his sister contacted the jail due to her concern that Presley was suicidal. (R. at

307-38.)  While incarcerated, Presley was given medications such as Coumadin, Zantac, Tylenol, ibuprofen, Warfarin and Motrin.  (R. at 307-38.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2008).  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

-32-

By decision dated April 27, 2007, the ALJ denied Presley's claims. (R. at 13-25.) The ALJ found that Presley met the disability insured status requirements of the Act for DIB purposes on the alleged onset date, noting that Presley would continue to meet the necessary requirements through September 30, 2010. (R. at 24.) The ALJ also found that Presley had not performed any substantial gainful activity since the alleged onset date. (R. at 24.) The ALJ determined that the medical evidence established that Presley suffered from severe impairments, namely a back disorder, chronic pulmonary disease, ("COPD"), and bilateral hearing loss. (R. at 24.) However, the ALJ found that Presley did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) The ALJ further found that Presley's allegations regarding his limitations were not totally credible. (R. at 24.) The ALJ determined that Presley retained the residual functional capacity to perform light work that did not involve concentrated exposure to noise, odors, fumes, dusts, gases, hazards, unprotected heights or dangerous machinery. (R. at 24.) The ALJ found that the limitations imposed by Presley's impairments might not preclude him from performing his past relevant work as a convenience store owner/operator. (R. at 24.) The ALJ acknowledged that Presley's limitations prevented him from performing the full range of light work; however, he determined that there were a significant number of jobs in the national economy that Presley was capable of performing, including jobs as a cashier, food preparation worker and fast food worker. (R. at 24.) Thus, the ALJ concluded that Presley was not under a disability as defined in the Act and that he was not entitled to benefits. (R. at 24-25.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

-33-

Presley argues that the ALJ's decision was not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-14.) Specifically, Presley contends that the ALJ erred in his evaluation of Presley's mental impairments and their impact on his ability to work. (Plaintiff's Brief at 6-10.) As such, Presley claims that the ALJ's failure to properly consider the ramifications of Presley's mental impairments results in a residual functional capacity finding that is unsupported by substantial evidence. (Plaintiff's Brief at 10.) Next, Presley argues that the ALJ's findings as to Presley's physical limitations were also unsupported by substantial evidence. (Plaintiff's Brief at 10-14.) In particular, Presley claims that the ALJ failed to accord proper weight to the medical opinions of record. (Plaintiff's Brief at 10-14.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975).

-34-

Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Presley's argument that the ALJ erred in evaluating his mental impairments. (Plaintiff's Brief at 6-10.) According to Presley, the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly consider Presley's mental impairments and their impact on his ability to work. (Plaintiff's Brief at 6-10.)

In rendering his decision, the ALJ concluded that Presley did not suffer from a severe mental impairment. (R. at 22.) The ALJ found that Presley retained the residual functional capacity to perform work at the light level of exertion that did not involve concentrated exposure to noise, odors, fumes, dusts, gases, hazards, unprotected heights or dangerous machinery. (R. at 24.) Thus, as evidenced by the ALJ's finding, the residual functional capacity determination failed to specifically mention any work-related mental limitations. As noted by Presley, a nonsevere impairment is an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2008). Therefore, in order to determine whether a claimant's impairments significantly limit his ability to perform basic work activities, it is necessary to examine the definition of basic work activities. According to the

-35-

Regulations, not only do basic work activities include certain physical activities, but they also include mental activities such as understanding, carrying out and remembering job instructions, the use of judgment, the ability to respond appropriately to supervision, co-workers and usual work situations and the ability to deal with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b)(2008). Presley's treating physician, Dr. Vanover, treated him on multiple occasions for psychiatric-related symptoms, making several findings and offering opinions as to how Presley's mental limitations impacted his ability to perform basic work activities.

Dr. Vanover treated Presley at Stone Mountain periodically from September 27, 2006, to March 5, 2007. (R. at 258-86.) During that time period, Presley not only complained of certain physical ailments, but he also reported mental health symptoms and impairments. For instance, on September 27, 2006, Presley presented to Stone Mountain reporting a history of severe chronic low back syndrome and severe anxiety disorder. (R. at 262.) Presley referenced his previous hospitalization in September 2003 due to depression and suicidal ideations, noting that he remained extremely anxious to the point that he sometimes could not hold a coffee cup. (R. at 262.) Presley also expressed financial concerns, noting that he could not afford to visit a doctor over the course of the year prior to this visit. (R. at 262.) Furthermore, Presley claimed that he was unable to sleep or eat and that his back pain had worsened. (R. at 262.) He also reported that he was largely restricted to his couch or bed, which rendered him unable to do most things. (R. at 262.) Dr. Vanover's assessment noted, among other things, chronic severe anxiety disorder. (R. at 263.) Presley was prescribed Klonopin and was advised to return to the clinic in one month.

-36-

(R. at 263.)

Presley presented to Dr. Vanover on October 30, 2006, for a monthly follow-up appointment regarding his problems. (R. at 271.) Dr. Vanover noted no significant changes in Presley's condition. (R. at 271.) Presley reported that he was sleeping better, but indicated that he continued to awake early, noting that once he woke up, he could not go back to sleep. (R. at 271.) Presley was advised to return in one month. (R. at 271.)

On October 30, 2006, Dr. Vanover completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 260-61.) With regards to Presley's ability to make occupational adjustments, Dr. Vanover determined that Presley possessed a fair ability to follow work rules, relate to co-workers, use judgment with the public and interact with supervisors. (R. at 260.) However, Dr. Vanover found that Presley had a poor or no ability to deal with the public, deal with work stresses, function independently or maintain attention and concentration. (R. at 260.) As for Presley's ability to make performance adjustments, Dr. Vanover found that Presley had a good ability to understand, remember and carry out simple job instructions, a fair ability to understand, remember and carry out detailed, but not complex, job instructions and a poor or no ability to understand, remember and carry out complex job instructions. (R. at 261.) Dr. Vanover also determined that Presley had a good ability to maintain personal appearance, behave in an emotionally stable manner and relate predictably in social situations; however, she noted that Presley's ability to demonstrate reliability was unknown. (R. at 261.) Lastly, it was concluded that Presley was capable of managing his benefits in his best interest. (R. at 261.)

-37-

Presley returned to Stone Mountain for a follow-up appointment with Dr. Vanover on November 29, 2006, and he acknowledged that he was sleeping better and that his anxiety had improved. (R. at 269.) Despite the improvement in his sleep patterns and anxiety level, Presley stated that had been anxious in the two weeks prior to the visit, noting that the Klonopin was not working as well as it had in the past and that he had not slept well during this two week period. (R. at 269.) Presley told Dr. Vanover that he needed an increase in his medication. (R. at 269.) Presley was diagnosed with chronic anxiety disorder and prescribed medication including Klonopin and Lortab. (R. at 270.) Dr. Vanover once again advised Presley to return for a follow-up in one month. (R. at 270.)

On December 5, 2006, Dr. Vanover completed another Medical Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 267-68.) Notably, Dr. Vanover's findings changed some in less than two months. Dr. Vanover found that Presley had a fair ability to follow work rules, relate to co-workers, use judgment with the public, interact with supervisors, function independently and maintain attention and concentration. (R. at 267.) Presley was found to have a poor or no ability to deal with the public and work stresses. (R. at 267.) While Dr. Vanover found that Presley possessed a fair ability to understand, remember and carry out simple job instructions, she determined that Presley had a poor or no ability to understand, remember and carry out complex and detailed job instructions. (R. at 268.) Dr. Vanover also found that Presley had a fair ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 268.) Just as in her previous assessment, Dr. Vanover concluded that Presley was capable of managing his benefits in his best interest. (R. at 268.)

-38-

Thus, after reviewing the record, it is readily apparent that Dr. Vanover's treatment notes and medical assessments not only referenced Presley's subjective psychiatric complaints, but the record shows that diagnoses of chronic severe anxiety disorder and/or chronic anxiety disorder were made. (R. at 263, 270.) Furthermore, the record also shows that Dr. Vanover opined that Presley had either a poor or no ability to perform several relevant basic work activities. (R. at 260-61, 267-68.)

In the ALJ's decision, he plainly stated that he accorded "very little weight" to the opinion of Presley's treating physician, Dr. Vanover. (R. at 23.) The ALJ noted that Dr. Vanover only saw Presley a limited number of times and that her treatment notes offered no objective medical findings. (R. at 23.) Thus, the ALJ determined that Dr. Vanover's opinions were inconsistent with the other evidence of record, including the findings set forth in the February 2006 consultative examination, as well as the findings of the state agency physicians and psychologists. (R. at 23.) The court recognizes that Presley failed to seek the treatment of a mental health professional and that the reviewing state agency psychologists opined that he did not suffer from any severe mental impairments. However, despite these facts, the court notes that the reviewing state agency psychologists and the consultative examination performed by Dr. Humphries were both conducted prior to Dr. Vanover's treatment of Presley. Thus, the reports and findings by the state agency psychologists and Dr. Humphries were completed without the benefit of relevant medical records from Presley's treating physician.

While Dr. Humphries' consultative examination certainly constituted an independent, personal examination of the claimant, the state agency psychologists

-39-

simply reviewed the relevant medical evidence of record as of the date of their evaluations. Therefore, had the state agency psychologists had the benefit of considering and evaluating the records of Dr. Vanover, it is reasonable to conclude that the resulting findings and opinions *may* have been different. Because the ALJ relied heavily upon the findings of the state agency psychologists in determining that Presley did not suffer from any severe mental impairments, under circumstances where the state agency psychologists did not consider the medical records and findings of Presley's treating physician in making their assessments, this court finds that substantial evidence does not support the ALJ's findings.

Moreover, the court cannot ignore the fact that Presley was previously hospitalized for depression and suicidal ideations. Although this hospitalization falls outside the relevant time period, as it was prior to Presley's alleged onset of disability, it nonetheless provides background and sheds light upon Presley's history of possible mental impairments. Additionally, the record contains information from Southwest Virginia Regional Jail that suggests Presley remained suicidal during the time period of March 7, 2007, to October 16, 2007, as a family member contacted jail authorities expressing concern for Presley's mental state. (R. at 307-38.) Based upon a review of the record, the court is of the opinion that, considering the ALJ's evaluation of Presley's mental impairments, there is not substantial evidence to support the ALJ's decision.

This court does not suggest that the consideration of the treating physician's notes and opinions would have certainly changed the state agency opinions. However, it is reasonable to conclude that such medical evidence *may* have altered

-40-

those opinions, thereby causing the state agency psychologists to impose certain mental limitations upon Presley's ability to work, which, in turn, could have impacted the ALJ's residual functional capacity determination. Thus, under the specific factual circumstances of this case, where the ALJ accorded such great weight to the state agency psychologists and physicians, who rendered their opinions without consideration of the treating physician's treatment notes and medical assessments, the court cannot find that there is substantial evidence to support the ALJ's conclusion.

Accordingly, the court hereby remands the case to the Commissioner for further evaluation of the claimant's mental impairments and the impact the impairments may have on his ability to perform basic work activities. That being the case, the court will not address the claimant's remaining arguments, as the undersigned is of the opinion that the remaining issues should be taken up after further consideration of the claimant's mental impairments by the Commissioner.

## IV. Conclusion

For the foregoing reasons, Presley's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated and the case will be remanded to the Commissioner for further consideration consistent with this Memorandum Opinion.

An appropriate order will be entered.

DATED:    This 22nd day of January 2009.

_____
THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

-42-